UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHESAPEAKE OPERATING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-301 |
| | § | |
| WILBUR DELMAS WHITEHEAD; dba | § | |
| WHITEHEAD PRODUCTION | § | |
| EQUIPMENT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 6, 2011, this matter was tried to the Bench.  Plaintiff, Chesapeake

Operating, Inc. ("Chesapeake") and Defendant, Cash Flow Experts, Inc. ("Cash Flow")

appeared by and through their respective counsel of record.  Defendant Wilbur Delmas

Whitehead d/b/a Whitehead Production Equipment ("Whitehead") appeared through his

counsel of record who announced that his client would not defend the claims made

against him and, if summoned to appear would assert his Fifth Amendment privilege

against self-incrimination.  Upon agreement of the parties, counsel for Whitehead was

excused from the proceedings.

After receiving evidence and pursuant to Fed. R. Civ. P. 52, the Court enters the

following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.    Chesapeake is in the business of exploring for oil and natural gas.

2.    Whitehead was a vendor that had supplied equipment to Chesapeake for oil and gas operations.

3.    On or about April 15, 2008, Whitehead and Cash Flow entered into a "Factoring and Security Agreement."

4.    Cash Flow is a factoring company that advanced loans to Whitehead based upon, and secured by, invoices for work that Whitehead had represented as documenting charges for completed work.

5.    Pursuant to the Factoring and Security Agreement, Whitehead assigned to Cash Flow its right to collect on some of its invoices that were addressed to Chesapeake for equipment that Whitehead represented that it had sold and delivered to Chesapeake.

6.    At the time of accepting the assignment of each invoice and pursuant to the Factoring and Security Agreement, Cash Flow paid to Whitehead the discounted amount of eighty percent (80%) of each invoice addressed to Chesapeake.

7.    Pursuant to the Factoring and Security Agreement, Cash Flow paid to Whitehead an additional amount, termed a "rebate," after Chesapeake paid each invoice, with the amount of the rebate being calculated upon an agreed percentage of the invoice and a sliding scale that varied with the promptness of payment.

8.    At issue in this case are 23 invoices that Whitehead issued to Chesapeake and assigned to Cash Flow pursuant to the Factoring and Security Agreement, which were paid in full by Chesapeake:

2 / 16

| No. | Invoice # | Date of Invoice | Amount |
|-----|-----------|-----------------|--------|
| 1 | 2455 | January 16, 2009 | $37,454.50 |
| 2 | 2456 | January 23, 2009 | $37,454.50 |
| 3 | 2459 | February 6, 2009 | $37,454.50 |
| 4 | 2463 | February 10, 2009 | $31,176.00 |
| 5 | 2464 | February 13, 2009 | $37,454.50 |
| 6 | 2468 | February 24, 2009 | $37,454.50 |
| 7 | 2470 | February 27, 2009 | $37,454.50 |
| 8 | 2472 | March 11, 2009 | $37,454.50 |
| 9 | 2473 | March 20, 2009 | $37,454.50 |
| 10 | 2475 | March 25, 2009 | $37,454.50 |
| 11 | 2483 | April 20, 2009 | $37,454.50 |
| 12 | 2485 | May 28, 2009 | $37,454.50 |
| 13 | 2488 | June 12, 2009 | $37,454.50 |
| 14 | 2490 | June 24, 2009 | $37,454.50 |
| 15 | 2491 | June 26, 2009 | $37,454.50 |
| 16 | 2493 | July 1, 2009 | $37,454.50 |
| 17 | 2495 | July 9, 2009 | $37,454.50 |
| 18 | 2499 | July 17, 2009 | $37,454.50 |
| 19 | 2500 | July 21, 2009 | $37,454.50 |
| 20 | 2512 | September 15, 2009 | $37,454.50 |
| 21 | 2513 | September 15, 2009 | $37,454.50 |
| 22 | 2515 | September 23, 2009 | $37,454.50 |
| 23 | 2516 | September 23, 2009 | $37,454.50 |

9.   Also at issue in this case are 8 invoices that Whitehead issued to Chesapeake and

assigned to Cash Flow pursuant to the Factoring and Security Agreement, which

were not paid by Chesapeake:

| No. | Invoice # | Date of Invoice | Amount |
|-----|-----------|-----------------|--------|
| 24 | 2520 | October 15, 2009 | $37,454.50 |
| 25 | 2521 | October 15, 2009 | $37,454.50 |
| 26 | 2525 | November 4, 2009 | $36,762.50 |
| 27 | 2526 | November 4, 2009 | $36,762.50 |
| 28 | 2528 | December 3, 2009 | $36,762.50 |
| 29 | 2529 | December 3, 2009 | $36,762.50 |
| 30 | 2532 | December 11, 2009 | $36,762.50 |
| 31 | 2533 | December 15, 2009 | $36,762.50 |

10. Each of the 31 invoices was for a piece of equipment described as "Production Skid – 48" OD x 5'6" 500# ASME Code Separator 3-Phase with Controls," which is also referred to as a "Fat Boy" separator.

11. Whitehead, through its invoices, represented to Chesapeake and to Cash Flow that it had delivered the referenced "Fat Boy" separators to Chesapeake.

12. Whitehead's representation that it had delivered the referenced "Fat Boy" separators to Chesapeake was a material misrepresentation as to both Chesapeake and Cash Flow.

13. Whitehead never delivered to Chesapeake any of the "Fat Boy" separators represented by the 31 invoices.

14. Whitehead breached its Factoring and Security Agreement with Cash Flow by assigning the 31 invoices to Cash Flow even though the "Fat Boy" separators had not been sold or delivered to Chesapeake.

15. At the time that Whitehead created each of its invoices, and at the time that it assigned those invoices to Cash Flow, it knew that the representation that it had delivered to Chesapeake the respective "Fat Boy" separators was false.

16. Whitehead accepted Cash Flow's payments pursuant to the Factoring and Security Agreement on the 31 invoices addressed to Chesapeake and assigned to Cash Flow.

17. Whitehead intended to induce both Chesapeake and Cash Flow to act upon its representation that it had sold and delivered to Chesapeake each of the respective "Fat Boy" separators referenced in the 31 invoices.

18. Each of the 31 invoices was sent to Chesapeake's Field Office located in Cleburne, Texas for payment.

19. Both Chesapeake and Cash Flow relied to their detriment on Whitehead's representation that the "Fat Boy" separators had been delivered to Chesapeake in processing the Whitehead invoices.

20. The payments on the 23 invoices that Chesapeake paid were made by checks payable to "Whitehead Production Equipment."

21. The payments on the 23 invoices that Chesapeake paid were remitted to "P.O. Box 260074, Corpus Christi, Texas 78426," an address controlled by Cash Flow.

22. The monies that Chesapeake paid and that were received by Cash Flow on the 23 paid Whitehead invoices was $855,175.00.

23. The amount of economic damages suffered by Chesapeake is $855,175.00.

24. After Invoice # 2520 was over 100 days old and unpaid, Cash Flow requested that Whitehead "repurchase" the invoice as required by the Factoring and Security Agreement and Whitehead did so.

25. The total amount that Cash Flow paid to Whitehead in connection with the 23 paid, but disputed, invoices in the form of the initial 80% loan was $684,140.00.

26. The total additional amount that Cash Flow paid to Whitehead in connection with the 23 paid, but disputed, invoices in the form of the "rebate" after Chesapeake paid the invoices was $99,300.76.

27.  The total amount that Cash Flow paid to Whitehead in connection with the 8 unpaid invoices, was $206,423.60 (which is 80% of the face value of the invoices, after deducting $37,454.50 for Invoice # 2520).

28.  After deducting the $855,175.00 paid by Chesapeake, Cash Flow was damaged in the total amount of $134,689.36.

29.  Because Cash Flow is being ordered to return $427,587.50 to Chesapeake pursuant to its money had and received cause of action, and because Cash Flow was held to be entitled to indemnity against Whitehead for Cash Flow's losses in this case, Cash Flow's total damages are $562,276.86.

30.  The amount of economic damages suffered by Cash Flow is $562,276.86.

31.  In November, 2009, Chesapeake initiated an investigation into the legitimacy of the Whitehead invoices.

32.  Chesapeake did not pay the remaining 8 invoices issued by Whitehead from October 15, 2009 to December 15, 2009.

33.  Both Chesapeake and Cash Flow, consistent with the foreseeable needs and risks of their respective businesses, had reasonable controls in place to detect fraud and to protect against it.

34.  Neither Chesapeake's nor Cash Flow's controls operated to protect them from the fraud of Whitehead.

35.  Chesapeake and Cash Flow relied upon the same representations by Whitehead that the invoices represented completed purchases and deliveries of "Fat Boy" separators to Chesapeake.

36. Both Chesapeake and Cash Flow were innocent with respect to the fraud perpetrated by Whitehead.

37. Cash Flow's business, by its nature, involves taking risks on other businesses' transactions and Cash Flow anticipates those risks, including fraud, with remedies built into its Factoring and Security Agreement, including (a) it has an indemnity and buy-back provision; (b) it only buys completed work invoices; (c) it only buys original invoices; (d) it has a lien against its customer's accounts; (e) it has the right to inspect Whitehead's records; and (f) it has a payment schedule that allows it to earn more on invoices that debtors take longer to pay.

38. Cash Flow purchased invoices dated between January 16, 2009 and April 23, 2009 in the total amount of $405,721.00 before Chesapeake paid any monies in satisfaction of any of the invoices at issue.

39. Chesapeake and Cash Flow were both defrauded by Whitehead.

40. Chesapeake incurred reasonable and necessary attorneys' fees to prosecute its claims (both claims that allow for recovery of attorneys' fees and claims that do not allow for recovery) in this case in the total amount of $144,527.50.

41. Cash Flow incurred reasonable and necessary attorneys' fees to defend the claims against it and to prosecute claims against Whitehead (both claims that allow for recovery of attorneys' fees and claims that do not allow for recovery) in the amount of $91,354.51.

42. The issues in this case pertaining to breach of contract, declaratory judgment, fraud, and money had and received are so interrelated and intertwined that

attorneys' fees incurred for prosecuting or defending the actions are not susceptible to meaningful segregation.

43. Whitehead has asserted his Fifth Amendment rights and refused to answer discovery in this case.

44. Whitehead has not contested or defended the causes of action asserted against him by Chesapeake and Cash Flow.

45. If called as a witness in this case, Whitehead would have asserted his Fifth Amendment rights and would have refused to provide testimony.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter of this case pursuant to 28 U.S.C. § 1332 because Chesapeake is an Oklahoma corporation and Defendants Whitehead and Cash Flow are citizens and residents of Texas and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Texas law governs the substantive issues in this diversity action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

3. Under Texas law, a defendant commits fraud when (1) the defendant makes a material representation that is false; (2) the defendant knows the representation is false or makes it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intends to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relies on the representation, which causes injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins.*

*Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 781 (Tex. App.—Houston [1ˢᵗ Dist.] 2009, pet. denied).

4. Whitehead committed fraud as to Chesapeake and Cash Flow.

5. Chesapeake is entitled to recover from Whitehead the $855,175.00 it paid on the invoices issued by Whitehead.

6. Cash Flow is entitled to recover from Whitehead the $562,276.86 damages that it has incurred on invoices that were fraudulently issued to Chesapeake.

7. Exemplary damages may be awarded upon proof by clear and convincing evidence that the harm with respect to which the claimant seeks recovery results from fraud.  Tex. Civ. Prac. & Rem. Code § 41.003(a)(1).

8. The evidence and findings of fact establish a firm belief that the allegations of fraud against Whitehead are true.  Accordingly, Chesapeake and Cash Flow have established their respective claims for fraud against Whitehead by clear and convincing evidence and are entitled to recover exemplary damages against Whitehead.  Tex. Civ. Prac. & Rem. Code §§ 41.001(2); 41.003(a)(1).

9. Before making an award of exemplary damages, the Court has considered the definition and purposes of exemplary damages as provided by Tex. Civ. Prac. & Rem. Code § 41.001.

10. Before making an award of exemplary damages, the Court has considered the evidence admitted as to (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct

offends a public sense of justice and propriety; and (6) the net worth of the defendant.  Tex. Civ. Prac. & Rem. Code § 41.011.

11.  Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages, not to exceed $750,000.

12.  The Court awards Chesapeake exemplary damages against Whitehead in the amount of $1,710,350.00.

13.  The Court awards Cash Flow exemplary damages against Whitehead in the amount of $738,701.00.

14.  The exemplary damage amount of $1,710,350.00 awarded to Chesapeake is within the statutory cap on exemplary damages.   Tex. Civ. Prac. & Rem. Code § 41.008(b).

15.  The exemplary damage amount of $738,701.00 awarded to Cash Flow is within the statutory cap on exemplary damages.   Tex. Civ. Prac. & Rem. Code § 41.008(b).

16.  The respective awards of exemplary damages to Chesapeake and Cash Flow do not require a finding of knowing and intentional conduct that constitutes a felony. Tex. Civ. Prac. & Rem. Code § 41.008(c).

17.  Under Texas law, the elements for a breach of contract cause of action are:  (1) a contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach.

*See Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).

18. Whitehead's invoices issued to Chesapeake constitute contracts, which Chesapeake performed by paying 23 such invoices.

19. Whitehead breached its contracts with Chesapeake, resulting in damages to Chesapeake in the amount of the $855,175 paid for "Fat Boy" separators that were never delivered.

20. Whitehead breached its Factoring and Security Agreement with Cash Flow, which Cash Flow performed by advancing 80% loans on the invoices, collecting them, and paying rebates to Whitehead.

21. Whitehead's breach of its contract with Cash Flow resulted in damages to Cash Flow in the amount of $562,276.86.

22. In Texas, a plaintiff may recover under a claim for money had and received by showing that it paid money to the defendant, by mistake or fraud, and that the money in equity or good conscience should be returned to the plaintiff. *See Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 207 (Tex. 2007).

23. A claim for money had and received is not premised on wrongdoing, but involves determining to which party, in equity, justice, and law, the money belongs, avoiding unconscionable loss to the payor and unjust enrichment to the payee. *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162-63 (Tex. 2007) (*per curiam*); *Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 763 (Tex. 1982).

24. In equity and good conscience, the losses caused by the scheme that Whitehead perpetrated against Chesapeake and Cash Flow, both, should be borne by both Chesapeake and Cash Flow.

25. In equity and good conscience, one-half of the monies paid by Chesapeake and received by Cash Flow belong to Chesapeake.

26. On its claims for money had and received, Chesapeake is entitled to recover from Cash Flow the sum of $427,587.50.

27. The court has made its determination on the money had and received claim after considering the evidence of the equities and with knowledge that the nature of the parties' respective business models and the treatment of the losses on the 8 unpaid invoices render a result in which the respective losses sustained by Chesapeake and Cash Flow as a result of Whitehead's fraud and breach of contract are not mathematically equal.

28. In a declaratory judgment action, the court has the discretion to award reasonable and necessary attorney's fees as are equitable and just.  Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Mercantile Nat'l Bank v. Bradford Trust Co*., 850 F.2d 215, 216 (5th Cir. 1988); *Rapid Settlements v. SSC Settlements*, L.L.C., 251 S.W.3d 129, 145 (Tex. App.—Tyler 2008, orig. proceeding).

29. The award of attorneys' fees is not permitted under the rules governing declaratory judgment actions if the claim for declaratory relief is duplicative of another claim for which the recovery of fees is not permitted.  *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 669-70 (Tex. 2009).  In other words, the declaratory

judgment act cannot be used as a contrivance to transform a no-recovery case into a recovery case with respect to attorneys' fees.

30. The declaratory judgment action adjudicated in this Court's summary judgment pertained to rights under an alleged contract and thus attorneys' fees may be awarded for that claim in this case. *See e.g., Allstate Ins. Co. v. Receivable Fin. Co.*, No. 3:01-cv-2247, 2002 WL 32254893, *2 (N.D. Tex. Feb. 26, 2002).

31. Courts may award attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 38.001 on breach of contract actions in which the claimant prevails and is awarded damages. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997).

32. A claim for money had and received is a common law cause of action and does not permit recovery of attorneys' fees for prosecution of the claim. *See generally, Amoco Prod. v. Smith*, 946 S.W.2d 162, 165-66 (Tex. App.—El Paso 1997, no writ).

33. Attorneys' fees are ordinarily not recoverable in a claim for fraud. *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 667 (Tex. 2009).

34. Intertwined facts do not make unrecoverable fees recoverable. But when discrete legal services advance both a recoverable and unrecoverable claim they are so intertwined that they need not be segregated. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006).

35. The "lodestar" method outlined in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563-66 (1986) provides an appropriate method for evaluating attorneys' fees in this case.

36. Factors considered in reviewing the attorneys' fee requests include the hourly rate, hours expended, the prevailing rates in the community, the time and labor required, the novelty and difficulty of the issues, the skill required to perform the legal service properly, the loss of other employment in taking the case, the type of fee, the time limits imposed, the amount of money involved and the result obtained, the attorneys' experience, reputation, and ability, and the undesirability of the case. *Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67, 70 (9th Cir. 1975); *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717 (5th Cir. 1974).

37. Chesapeake is entitled to recover its attorneys' fees against Whitehead in the amount of $144,527.50.

38. Cash Flow is entitled to recover its attorneys' fees against Whitehead in the amount of $91,354.51.

39. With respect to the causes of action as between Chesapeake and Cash Flow, each shall bear its own attorney's fees and costs.

40. In their respective claims against Whitehead, both Chesapeake and Cash Flow are entitled to adverse inferences against Whitehead arising from his assertion of his Fifth Amendment rights. *E.g., Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2005).

41. "Failure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question." *United States v. Hale*, 422 U.S. 171, 176, (1975). *See also Mitchell,*

*supra; Baxter, supra; United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-154, (1923) ("Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character").

42. Although an adverse inference may be drawn against a party who invokes the Fifth Amendment privilege and refuses to testify in a civil proceeding, that silence alone is insufficient to support an adverse decision. *See Baxter, supra*; *Pagel, Inc. v. S.E.C.*, 803 F.2d 942, 946-47 (8th Cir. 1986).

43. The purpose underlying the allowance of an adverse inference in civil cases is equitable, not punitive, and serves to vitiate the prejudice to the party denied evidence by invocation of the privilege. *See United States v. 4003–4005 5th Ave.*, 55 F.3d 78, 82–83 (2d Cir.1995).

44. There was sufficient evidence to support all of the elements of all of the claims brought by both Chesapeake and Cash Flow against Whitehead such that it would have been natural for Whitehead to provide evidence in his favor if such evidence existed.

45. While Chesapeake and Cash Flow are entitled to adverse inferences against Whitehead, and while the Court determines that it is equitable to apply adverse inferences in this case against Whitehead, such inferences are not necessary to this Court's disposition of this case.

## <u>CONCLUSION</u>

Any finding of fact herein that is more properly construed as a conclusion of law shall be so construed, and vice versa.  For the reasons stated above:

- On its claim for fraud against Whitehead, Chesapeake is entitled to recover against Whitehead the sum of $855,175.00 as compensatory damages, $1,710,350.00 as exemplary damages, along with pre- and post-judgment interest and costs.

- On its claim for fraud against Whitehead, Cash Flow is entitled to recover against Whitehead the sum of $562,276.86 as compensatory damages, $738,701.00 as exemplary damages, along with pre- and post-judgment interest and costs.

- On its claim for breach of contract against Whitehead, Chesapeake is entitled to recover against Whitehead the sum of $855,175.00 as compensatory damages, attorney's fees in the amount of $144,527.50, along with pre- and post-judgment interest and costs.

- On its claim for breach of contract against Whitehead, Cash Flow is entitled to recover against Whitehead the sum of $562,276.86 as compensatory damages, attorney's fees in the amount of $91,354.51, along with pre- and post-judgment interest and costs.

- On its claim for money had and received against Cash Flow, Chesapeake is entitled to recover against Cash Flow the sum of $427,587.50, along with pre- and post-judgment interest.

ORDERED this 19th day of September, 2011.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE